# IN THE UNITED STATES DISTRIT COURT

## FOR THE DISTRICT OF COLORADO

## AP DOCKET

**Civil Action Number 20-cv-01366-MSK**

**ANDREA C JOHNSTON,**

     **Plaintiff,**

**v.**

**ANDREW M. SAUL, Commissioner of Social Security,**

     **Defendant.**

---

### PLAINTIFF'S OPENING BRIEF - CORRECTED

---

## I.     INTRODUCTION AND REQUEST FOR RELIEF

The Plaintiff respectfully requests the Court to review this case and reverse the unfavorable decision of the Administrative Law Judge (ALJ), where she determined the Plaintiff "not disabled".

The Plaintiff further requests the Court to remand for immediate award of Disability Insurance Benefits (DIB), representing the maximum monthly amount and any additional relief as may be just and proper under the circumstances of this case. **The delays in awarding the Plaintiff her DIB continue to cause debilitating financial stress and exacerbate the Plaintiff's mental health symptoms.**

The Plaintiff respectfully contends that the ALJ made errors of law, as defined by the United States Federal Administrative Law, within Codes of Federal Regulations (CFRs) **20 CFR 404.1520** *et seq.***, and 20 CFR 416.920** *et seq.***,** and within **20 CFR 404.1529** *et seq.***;** and **20 CFR 416.929** *et seq.*.

She further contends that the ALJ erred by misapplying several rules in the Social Security Rulings (SSRs): **SSR 16-3p**, **SSR 96-8p** and **SSR 00-4p**.

## II.   STATEMENT OF FACTS

### A.  Standard of Review

The standard of review in this case is Statute 42 USC 405(g) and Statute 42 USC 1383(c).

### B.  Jurisdiction

The Plaintiff's right to Federal Court review for claims under Title II (Social Security) is provided for in Section 205(g) of the Social Security Act. This section is also Section 405(g) of the United States Code.

The right to Federal Court review for claims under Title XVI (Supplemental Security Income) is provided for in the Section 1631(c)(3) of the Social Security Act. This is also Section 1383(c) of Title 42 of the United States Code.

The Plaintiff resides at 6217 South Sterne Parkway in Littleton, Colorado, and the hearing presided by ALJ Cynthia K. Hale on September 23, 2019, took place at the Denver Office of Hearings Operations (OHO), located at 1244 Speer Boulevard in Denver, Colorado.

The ALJ's decision became the final decision of the Commissioner of Social Security in the Plaintiff's case, as stated in the notification letter from the Appeals Council (AC), dated April 17, 2020. The Plaintiff has exhausted all administrative remedies available.

Thus, the United States District Court for the District of Colorado is the appropriate venue for this case.

## C. Procedural History

On June 28, 2018, the Plaintiff protectively filed a Title II application for a period of disability and DIB, as Social Security Disability Income (SSDI). The Plaintiff also protectively filed a Title XVI application for Supplemental Security Income (SSI). In both applications, the Plaintiff stated her inability to work began June 15, 2017. These claims were denied initially on October 1, 2018. **(AR 96-99)** Thereafter, the Plaintiff filed a written request for hearing on October 25, 2018. (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*) **(AR 100)**

The Plaintiff appeared and testified at a hearing held on September 23, 2019, in Denver, Colorado with Cynthia K. Hale, ALJ, presiding.

William J. Tysdal, an impartial vocational expert (VE), also appeared at the hearing. The Plaintiff was represented by Thomas G. Hill, an attorney. The Plaintiff was notified of "Decision – Unfavorable" in a letter from the ALJ dated November 6, 2019. **(AR 10-29)**

Plaintiff's attorney Steven R. Earl filed a request to have the ALJ's decision reviewed by the Appeals Council (AC), at the U.S. Social Security Administration - Office of Disability Adjudication and Review on December 10, 2019. **(AR 155-156)** The Plaintiff's attorney Thomas G. Hill submitted a Representative Brief to the AC on January 7, 2020. **(AR 252-254)** The AC denied to review the ALJ's decision, so the ALJ's decision became the final decision of the Commissioner of Social Security in the Plaintiff's case, as stated in the AC's notification letter, dated April 17, 2020. **(AR 1-6)**

On May 13, 2020, the Plaintiff filed a Federal complaint in United States District Court, District of Colorado, for review and reversal of the ALJ's decision of "not disabled". **(ECF 1)**

**D.  Plaintiff's History of Mental Disorders**

The Plaintiff's mental disorders have spanned more than forty years, precipitated by long-term persistent trauma she suffered from childhood, and continuing into her adulthood, for decades**. (AR 19, 249-251)** Beginning in 1978, she witnessed her mother suffer from severe alcoholism and attempt suicide dozens of times. She witnessed her

mother being revived from flatline emergency events on multiple occasions, and placed on psychiatric holds in hospitals.

From age 12 until age 22, the Plaintiff was convinced that she carried the daily responsibility to monitor and keep her mother alive, and to protect her younger brother from her mother's self-destructive and abusive behavior. The Plaintiff's father was living in another state with his new family, and the Plaintiff was afraid to ask for help family members or anyone else, because of the shame it caused her family, and the anger it caused from her mother.

The Plaintiff did not receive professional mental health treatment until her diagnoses of depression and anxiety, following an emotional breakdown in 2001. **(AR 19)** Prior to age 35, the Plaintiff remained untreated and unmedicated for her mental disorders. During that time, she was involved in two abusive relationships, where she endured physical and emotional trauma over a period of many years. Her coping mechanisms became so fatigued that average stressors had become very exaggerated in her mind.

During late 2001 and early 2002, she suffered the deaths of both of her grandmothers, who had been her dearest relatives and best parental figures throughout her life. **(AR 251)** This caused the Plaintiff to fall into a deep, grieving depression, forcing her to leave the highest paying job in her work history, where she earned more than $80,000 in salary. Her

earning capacity declined steadily thereafter, until she became unable to work at all.[1] in 2017. **(AR 165-166)**

In 2003, the Plaintiff lost her marriage and primary custody of her two small children, ages five and six, due to her mental health functional impairments. **(AR 468-486)**

During several years between 2001 and 2017, the Plaintiff was unable to work, due to mental distress. **(AR 165-166)** During these times, she did not have insurance and remained untreated, without medications. Whenever she did manage to keep a job and health insurance, she continued mental health care treatment and her prescriptions. **(AR 468-486)**

In September 2007, the Plaintiff suffered debilitating shock when her first cousin died by suicide, via shotgun. **(AR 251)** She fell again into debilitating grief and depression. She was unable to work full time, so she worked part-time from 2007 until 2012. **(AR 165-166)**

Beginning in July 2012, the Plaintiff managed to start work full-time again, earning $16.00 per hour. In September 2016, the Plaintiff was forced to leave her job, because she was no longer able to cope with the mental distress she suffered at work. **(AR 19)** She began working

---

[1] The Plaintiff received income in 2017 from her former employer, Computershare. This compensation represented back-pay for wages she earned from January to August of 2016. **(AR 15)**

part-time from home on June 1, 2017, and was forced to quit again just a few weeks later, due to a devastating mental crisis. **(id.)**

On June 15, 2017, the Plaintiff's 19-year-old daughter was diagnosed with sudden onset of bipolar-1 disorder and schizo-affective disorder. That same day, her daughter learned from her psychiatrist that her prognosis was very grim. She was devastated, and attempted suicide by swallowing lethal doses of both of her psychiatric prescriptions.

The Plaintiff witnessed her youngest child stop breathing on the way to Littleton Hospital, where her daughter was revived. **(AR 249-251)** However, her daughter suffered serious organ damage to her heart, lungs, liver and brain due to drug poisoning. The Plaintiff's daughter remains afflicted with delusions, hallucinations and drug addiction, and she has been homeless, hospitalized and transient since 2018.

Soon after her daughter's suicide attempt in June 2017, the Plaintiff began re-experiencing many years of unresolved traumatic events from the previous decades of her life, causing overwhelming emotional pain, anxiety and inability to cope with stress. Her nightmares were horrific, and she was unable to sleep. **(id.)** On June 20, 2017 she was rushed to Littleton Hospital during a panic attack, then referred to AllHealth Network in Littleton for outpatient treatment. **(AR 249, 288-292)**

The Plaintiff remains in treatment for bi-weekly therapy and psychiatric sessions every three months. **(AR 293-441, 563-662)** She was diagnosed with post-traumatic stress disorder (PTSD) in 2017**,** in addition to depression and anxiety. **(AR 309)**

The Plaintiff's prescriptions have been significantly increased and/or replaced over time, because her body developed a tolerance causing the medications to stop working. **(AR 309, 314, 323, 334,429, 608-610, 661)** The Plaintiff is resistant to increasing her dosages of prescriptions, due to the severe side effects of sedation and fatigue. **(AR 19)**

Despite her diligence in continuous treatment at AllHealth Network since 2017, the Plaintiff's debilitating symptoms of depression, anxiety and PTSD have not been cured. Her medications do not alleviate all of her symptoms. **(id.) Her condition has been classified as "chronic" consistently, by her treating mental health physicians, since 2013:**

1. Dr. Linda Williams, MD., **(AR 269-286)**

2. Dr. Michael R. Greher, PhD. (neuropsychologist), from UCHealth **(AR 549)**

3. Dr. Maninder Bali, MD from AllHealth Network. **(AR 320, 322, 331, 395, 425, 436, 574, 580, 592, 599, 618, 624, 630, 650, 657, 673)**

In addition, Dr. Bali's professional mental evaluation in September 2019 (a few weeks prior the ALJ hearing), states that the Plaintiff's prognosis was "fair" and her response to treatment was also "fair". **(AR 669) Dr. Bali also stated that the Plaintiff's *"symptoms are recurrent and severe which impair functioning"*. (AR 674)**

The Plaintiff began working with her therapists in bi-weekly sessions at AllHealth Network in 2017 to strengthen her coping skills and to begin healing emotional scars from her past. **(AR 293-441, 563-662)** Due to a series of overwhelming events soon after, most of the Plaintiff's therapy sessions were dedicated to crisis management and coping with her daily stress. **(AR 249-251)** Therefore, her deep emotional scars have not been resolved, and she suffers re-experiencing old trauma on a daily basis. She remains in treatment bi-weekly and is highly dedicated to continuing her mental health treatment indefinitely, working toward healing herself.

The Plaintiff struggled against homelessness in 2018 **(AR 419, 424, 427)**, and she continues to suffer from debilitating anxiety, caused by her inability to secure housing for herself. Her symptoms remain severe, exacerbated by the continuing series of traumatic events caused by her daughter's mental illness and unrelenting anxiety caused by her financial distress.

### E. Key Findings of the ALJ

**Summary:** *"The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g))."* **(AR 24)**

**RFC Findings:** The ALJ's findings regarding the Plaintiff's Residual Functioning Capacity (RFC): *"After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is limited to unskilled job tasks. Further, she is able to have no interaction with the general public and only occasional interaction with coworkers and supervisors. She is unable to engage in tandem job tasks. Moreover, she must avoid exposure to large crowds and loud noises, such as noises louder than office noise. Finally, the claimant is limited to a low stress work environment with no production rate or constant motion job tasks."* **(AR 18)**

**Five Steps Required:** *"Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a))."* **(AR 14)**

**Step One Findings:** *"The claimant has not engaged in substantial gainful activity since June 15, 2017, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)."* **(AR 15)**

**Step Two Findings:** *"The claimant has the following severe impairments: major depressive disorder; posttraumatic stress disorder (PTSD); generalized anxiety disorder; and adjustment disorder (20 CFR 404.1520(c) and 416.920(c)). The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28."* **(AR 16)**

**Step Three Findings:** *"The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)."* **(id.)**

**Step Four Findings:** *"The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)."* **(AR 22)**

**Step Five Findings:** *"Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."* **(AR 24)**

**Decision:** *"Based on the application for a period of disability and disability insurance benefits protectively filed on June 28, 2018, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Based on the application for supplemental security income protectively filed on June 28, 2018, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act."* **(id.)**

## F.  Plaintiff's Review of the ALJ's Findings

The ALJ erred by making false deductions. The ALJ's reasons for refuting the Plaintiff's evidence are not substantial and they misrepresent the evidence of record, as a whole. These presumptions were simply not true, and they are based on a few obscure citations that do not stand together to support her findings of facts. The following are examples of isolated notations and errant conclusions the ALJ stated as her reasons for finding the Plaintiff "not disabled":

1. *"…not consistent with the results of the claimant's mental status examinations, which largely showed normal concentration, attention, and memory (4F; 15F/7; 16F)."* **(AR 21)**

2. *"… not consistent with the treatment records as a whole, which demonstrate that the claimant's mental health conditions improved as time passed (4F; 16F)."* (**AR 22**)

3. *"… the claimant said she can walk a mile on a good day and her gait and station were normal during physical examinations (6E/7; 15F/27)."* **(AR 16)**

4. *"Moreover, this condition may be related to the claimant's low vitamin D storage[2] value noted in her medical records (4F/124)."* **(id.)**

5. *"the claimant scored in the above average range for verbal learning and memory (15F/7, 19-20)."* **(AR 17)**

6. *"The claimant was also able to list the months forward and backwards (15F/7)."* **(id.)**

7. *"In May 2019, the claimant reported having good concentration (16F/95*)." **(id.)**

8. *"On neurocognitive tests, the claimant scored in the above average range (15F/7)."* **(id.)**

9. *"During mental status and physical examinations, the claimant's appearance was within normal limits (4F; 15F/7, 27; 16F)."* **(id.)**

10. *"The claimant's judgment and insight were also noted to be normal on several occasions (4F; 15F/7; 16F)."* **(AR 17-18)**

11. *"During physical examinations, the claimant was noted to have a normal mood, affect, and behavior (12F/3, 5). On*

---

[2] This comment by the ALJ is a medical speculation, and depicts a tendency toward drawing speculative conclusions from isolated notations in the evidence of record.

*neurocognitive tests, the claimant scored in the above average range as well (15F/7)."* **(AR 20)**

12. *"… the extreme limitations are not supported by Dr. Bali's treatment records, which showed that the claimant's mental health conditions improved after the alleged onset date (4F; 16F). They are also not consistent with the results of the claimant's mental status examinations, which largely showed normal concentration, attention, and memory (4F; 15F/7; 16F)."* **(AR 21)**

13. *"The undersigned finds these opinions to be unpersuasive as they are not supported by Dr. Bali's treatment records, which showed that the claimant's mental health conditions improved between after the alleged onset date (4F; 16F). It is also not consistent with the results of the mental status examinations, which largely showed normal concentration, attention, and memory (4F; 15F/7; 16F)."* **(id.)**

Specifically, the ALJ relied heavily on a single page from the hearing exhibits, which was "15F/7", to portray the Plaintiff's mental status as "normal" or "above average". **(AR 17-22)** This one page is just cursory intake notes from UCHealth, dated December 13, 2018. **(AR 538)** Furthermore, the ALJ's citations do not accurately portray the context within which the UCHealth records were documented.

The purpose for the Plaintiff to seek neurological testing at UCHealth was to rule out any brain injury that may have been caused during her major surgery in 2016, when she experienced serious complications due to prolonged anesthesia. **(AR 266, 533)**

Thankfully, after extensive treatment at UCHealth from December 2018 until May 2019, the Plaintiff was relieved to find out that her severe problems with memory and concentration were not attributed to any physical anomalies in her brain. UCHealth physicians determined that stressors were most likely causing her memory and concentration problems. As such, UCHealth physicians recommended that she continue treatment for her chronic symptoms of anxiety and depression at AllHealth Network. **(AR 542)**

In his summary of findings, the Plaintiff's treating neuropsychologist, Dr. Greher, clarified a common misconception related to the discrepancy between the Plaintiff's positive test results compared to her functional limitations. On March 19, 2019, Dr. Greher stated:

> *"Of course, it is understood that there is a notable discrepancy between the patient's cognitive complaints and her actual abilities observed in objective testing. Such discrepancies are not uncommon in patients with significant psychological challenges and stressors, which tend to impact people more negatively in the course of more*

> *challenging demands of everyday life than they do in the*
> *controlled environment of neuropsychological testing."*
>
> *"I obviously fully support the patient's ongoing mental health*
> *treatments at AllHealth, given the chronic and severe nature*
> *of these challenges, and encourage her to inquire as to*
> *whether more frequent consultations with her psychiatrist*
> *(e.g., once per month) are possible, to help maximize her*
> *benefit."* **(AR 549)**

Likewise, the ALJ relied heavily on hearing exhibits "4F" and "16F" to refute the Plaintiff's evidence. **(AR 293-441) (AR 563-662)**. The following misleading presumption was used repeatedly throughout the ALJ's decision: "***the claimant's mental health conditions improved after the alleged onset date*** *(4F; 16F)*." These two exhibits represent hundreds of pages of medical records from AllHealth Network. She excluded all references within exhibits "4F" and "6F" which often stated Plaintiff's status was "abnormal" and "unstable/worsening". The citations used by the ALJ from these 700 pages are isolated and misleading.

She also excluded all references to the Plaintiff's condition classified as "chronic". The following are examples of the ALJ's exclusions:

1. *"abnormal"* **(AR 333, 349, 428, 571, 576, 595, 620, 626)**

2. *"unstable/worsening"* **(AR 322-324, 333-334, 350-351, 566-567, 571-572, 577-578, 596, 622, 627-628)**

3. *"chronic"* **(AR 320, 322, 331, 395, 425, 436, 574, 580, 592, 599, 618, 624, 630, 650, 657)**

**The ALJ refused to evaluate important lay evidence from the Plaintiff's closest friend and family members.** These documents from 2018 and 2019 clearly depict observations of the Plaintiff's chronic functional limitations, witnessed in person, over an extended period of time. **(AR 249-251, 489-495)** The ALJ did not provide substantial legal reasons for her rejection of this important lay evidence. Instead, she stated in her decision, ***"Since these are not medical opinions, the undersigned need not specifically evaluate these statements"***. **(AR 22)**

In her RFC, the ALJ did not substantially explain her findings of the Plaintiff's abilities *"to perform a full range of work at all exertional levels"*, based on the evidence of record. **(AR 18)** Furthermore, she refuted the Plaintiff's claims of exertional limitations without providing substantial reasons to support her dismissals, based on the evidence of record. She stated:

1. *"The claimant also reported experiencing fatigue (3E/2; 4F/124). However, there is no medically determinable impairment in the treatment records to explain the claimant's fatigue (1F-20F)."* **(AR 16)**

2. *"Without objective medical evidence in the record[3], the claimant's shoulder problems and fatigue are not medically determinable impairments."* **(id.)**

The ALJ based the majority of her reasons in her decision of "not disabled" on the reports from Disability Determination Services (DDS), which are not consistent with the record, as a whole. The ALJ relied heavily on documentation from DDS physicians "Lori Leopold, D.O.", and "Sarah Sexton, Psy.D.," **(AR 20-21).**

The DDS recommendations were completed in September 2018 and deduced from the Plaintiff's disability claim forms and deficient medical records. These reports provide a very narrow, incomplete and outdated view of the Plaintiff's condition. **(AR 80-92)** DDS records state repeatedly: ***"There is no indication that there is a medical opinion from any medical source."*** **(AR 71, 73, 88, 90)**

---

[3] There is plenty of objective medical evidence in the record to substantiate the Plaintiff's claims of fatigue, including professional mental health evaluations performed by Dr. Bali in October 2018 and September 2019.

Thus, the DDS recommendations excluded both of Dr. Bali's professional mental health evaluations, which were performed face-to-face in October 2018 and September 2019, **(AR 498-502, AR 668-674)**

Furthermore**, DDS physicians made no contact with the Plaintiff**, whatsoever. After DDS recommendations were completed in September 2018, one full year passed before the ALJ hearing in September 2019. Consequently, twelve vital months of the Plaintiff's treatment records were also excluded from the DDS findings.

Thus, the DDS opinions were formed on significantly underdeveloped evidence, excluding essential details of the Plaintiff's chronic mental health condition.

The ALJ's deductions of evidence from the Plaintiff's treating psychiatrist, Dr. Bali, were split. The ALJ found agreeable all of Dr. Bali's "mild" and "moderate" opinions, which supported her finding of "not disabled". However, with transparent precision, the ALJ rejected all of the "marked" and "extreme" opinions in Dr. Bali's professional mental health evaluations from 2018 and 2019. **(AR 21, 498-502, 668-674)**

These rejections by the ALJ caused criteria to remain unsatisfied in "paragraph B" of the mental health evaluation regarding "severity and persistence" of functional limitations for determining the Plaintiff disabled, under listings 12.04, 12.06 and 12.15, in step three of the five-step

sequential evaluation process for determining whether an individual is disabled.[4] The ALJ's reasons for finding Dr. Bali's opinions unpersuasive are not substantial, nor consistent with the evidence of record, as a whole.

Her reasons are based on the aforementioned false presumptions, upon which she founded her ultimate determination of "not disabled". Below are the ALJ's findings, refuting Dr. Bali's objective medical evidence:

1. *"In October 2018, the Dr. Bali opined that the claimant has extreme limitations in her ability to make judgments on complex work-related decisions and marked limitations in her ability to understand, remember, and carry out complex instructions (10F/2; 11F/2)."* (**AR 21)**

2. *"She also found that the claimant had moderate impairments in her ability to make judgments on simple work-related decisions and respond appropriately to usual work situations and changes in a routine work setting (10F/2-3;11F/2-3). She also opined that the claimant had a mild impairment in her ability to understand, remember, and carry out simple instructions (10F/2; 11F/2). Furthermore, she noted that the*

---

[4] For the remainder of this Opening Brief document, the phrase "step three" means, specifically, "step three of the five-step sequential evaluation process for determining whether an individual is disabled", whenever this portion: "…of the five-step sequential evaluation process for determining whether an individual is disabled" is not included.

claimant has a poor memory (10F/3; 11F/3). The
undersigned finds this opinion to be somewhat persuasive."
**(id.)**

3. "Although Dr. Bali noted that she based her assessment on
   a psychiatric assessment, she did not include any specific
   details or citations from that assessment to support her
   opinion (10F). The undersigned finds her moderate
   limitations to be supported by and consistent with the
   treatment records, which demonstrate that the claimant
   consistently pursued treatment for her mental health
   conditions (1F-20F)." **(id.)**

4. "However, the extreme limitations are not supported by Dr.
   Bali's treatment records, which showed that the claimant's
   mental health conditions improved after the alleged onset
   date (4F; 16F). They are also not consistent with the results
   of the claimant's mental status examinations, which largely
   showed normal concentration, attention, and memory (4F;
   15F/7; 16F)." **(id.)**

5. "Additionally, in September 2019, Dr. Bali found that the
   claimant was seriously limited or unable to meet competitive
   standards in a number of mental abilities and aptitudes
   needed to perform unskilled, semiskilled, and skilled work

*(20F/4-5). She also found that the claimant had marked limitations in her ability to concentrate, persist, maintain pace, and adapt in the workplace and mild limitations in her ability to remember and apply information (20F/6). Further, she opined that the claimant would likely miss more than four days of work per month if she were to work on a full-time basis (20F/7)."* **(id.)**

6.   *"The undersigned finds these opinions to be unpersuasive as they are not supported by Dr. Bali's treatment records, which showed that the claimant's mental health conditions improved between after the alleged onset date (4F; 16F). It is also not consistent with the results of the mental status examinations, which largely showed normal concentration, attention, and memory (4F; 15F/7; 16F)."* **(id.)**

The ALJ's findings only slightly discuss facts regarding the extensive duration of the Plaintiff's mental illness: "*The claimant noted that she has struggled with depression since her teens and it was first treated in 2001 (4F/3)."* **(AR 19)**

The Plaintiff's evidence represents decades of severe symptoms, originating from childhood trauma. The ALJ disregarded the consistent longitudinal evidence of long-term psychiatric treatment in the evidence of record, from 2003 to 2016. **(AR 269-286, 467-486)**

The ALJ also refused to evaluate non-medical evidence provided by the Plaintiff's ex-husband, describing his observations of the Plaintiff's condition over time, from 1994 – 2019. **(AR 251)** The following records provide important insight regarding the history and long-term impact of the Plaintiff's mental health challenges:

1.  1994 – 2019: Bradley Johnston, Plaintiff's ex-husband. Mr. Johnston's witnessed the Plaintiff's anguish from depression and anxiety over an extended period of time. **(id.)**

2.  2013 – 2016: Dr. Linda Williams, MD. The Plaintiff's prior records from Dr. Williams stated the "duration" of the Plaintiff's condition as "chronic" at each session. **(AR 269-286)**

3.  2003 – 2013: Colorado PsychCare. Ilene Nova, PA-C. These years reflect intermittent treatment while the Plaintiff struggled to work and keep her health insurance.  **(AR 467-486)**

The ALJ's findings of facts represent omitted pivotal testimony of the VE. Based on the RFC limitations, the VE had recommended three positions to the ALJ that he believed would be appropriate for the Plaintiff. **(AR 58)** The ALJ then continued her questioning to inquire about the effects of additional limitations on the prospective vocations listed in the DOT. She asked the VE whether off-task interruptions or absenteeism would rule out the three recommended jobs.

The VE confirmed that either of the additional limitations would effectively rule out all available positions in the DOT. **(AR 58-59)** The following is an excerpt from the ALJ questioning the VE at the hearing:

> *"Q. Okay. All right, and then if the individual, due to symptoms they were experiencing, were going to be off task 15 percent of the workday, would that rule out those jobs?*
>
> *A. Yes, I believe it would.*
>
> *Q. And all competitive employment?*
>
> *A. Yes, Your Honor.*
>
> *Q. Okay. And then take that last one off, if the individual were going to be expected to leave early or be absent two workdays a month on a consistent basis, would that rule out those jobs?*
>
> *A. Yes, I believe it would.*
>
> *Q. Okay, and all competitive employment?*
>
> *A. Yes."* **(id.)**

The ALJ found the Plaintiff "not disabled" without resolving the discrepancies raised by the VE's testimony, that "low-stress work" and "production rate" from the RFC are not included in the DOT. She concluded:

*"Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule."* **(AR 24)**

1. Prior to the ALJ's finding of "not disabled", the VE testified that his recommendations were *"consistent with the DOT"*, but then **he clarified that most of the non-exertional limitations in the RFC are not included in the DOT**[5]. He stated:

   *"I have supplemented that publication with my experience in the vocational field to answer many of the questions you've asked regarding public contact, co-workers, supervisors, tandem tasks, low-stress work, production rate… crowds of people and off task and absenteeism. Those things aren't specifically addressed in the DOT, so, again, I relied on my experience to answer those questions."* **(AR 59-60)**

---

[5] The VE stated his job recommendations to the ALJ with clarifications to explain that most of the non-exertional limitations in the RFC are not included in the DOT. Setting aside all the limitations not included in the DOT, the RFC had very few remaining non-exertional restrictions: "loud noises", "constant motion job tasks", and the requirement of "unskilled job tasks".

2.   The ALJ addressed this discrepancy in her decision letter, stating:

> *"The vocational expert testified that in addition to relying on the DOT, he supplemented his testimony with his education, experience, and training regarding limitations involving public contact, tandem work, coworkers and supervisors, low stress work, production rates, crowds of people, off-task, and absenteeism."* **(AR 24)**

3.   She then continued:

> *"Accordingly, the undersigned finds the vocational expert's testimony reliable. Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles."* **(id.)**

4.   While the ALJ's next statement resolved the discrepancies involving "interaction with others", it did not resolve limitations of "low-stress work" and "production rate", which are specified in the RFC. She stated:

> *"However, the undersigned recognizes that the DOT does not specifically cover interaction with others. **To the extent that the DOT does not consider limited interaction with**

***others in the positions listed above***, *the undersigned relies on the vocational expert's education, experience, and training. Accordingly, the undersigned finds the vocational expert's testimony reliable."* **(id.)**

### G. Medical Evidence

The Plaintiff is eligible for DIB under one, two or three impairments[6], under listings: 12.04 for depressive, bipolar and related disorders; 12.06 for anxiety and obsessive-compulsive disorders; and 12.15 for trauma- and stressor-related disorders, in the Listing of Impairments. **(20 CFR 404, Subpart P, Appendix 1)**

1. The Plaintiff has been a patient in ongoing treatment for mental health disorders at AllHealth Network, since June 2017. **(AR 293-441, 563-662)** The Plaintiff's mental health symptoms persisted non-stop for a period significantly longer than twelve months prior to the ALJ hearing date in September 2019. Therefore, the "paragraph A" requirements had already been satisfied for determining the Plaintiff "disabled" at step three. **(20 CFR 404.1520(a) and 416.920(a))** The ALJ did not dispute this fact in her decision.

---

[6] The Plaintiff understands that a DIB payment amount calculation is not affected, based on whether or not a claimant is found disabled under multiple listings. The Plaintiff respectfully includes all three of these listings, based on her mental health diagnoses, because she is not aware if any of the three takes precedent over another.

2.  The Plaintiff's treating psychiatrist, Dr. Bali, clearly stated several functional limitations as "marked" and "extreme", over an extended period of time, in her 2018 and 2019 professional mental health assessments. **(AR 498-502, 668-674)** This objective medical evidence is consistent with the Plaintiff's testimony and the evidence of record, as a whole. Therefore, "paragraph B" requirements of "severe and persistent" limitations were also satisfied for determining the Plaintiff disabled at step three, under listings 12.04, 12.06 and 12.15, in the Listing of Impairments. **(20 CFR 404, Subpart P, Appendix 1)** This fact was refuted by the ALJ in her decision. **(AR 18)** However, the evidence cited by the ALJ was based on isolated, temporal facts that were insufficient to support her findings. In contrast, the Plaintiff's evidence of record consistently substantiates her claims of "severe and persistent" limitations. **(20 CFR 404.1520(c)(3) and 20 CFR 416.929(c)(3)) (SSR 16-3p)**

The Plaintiff's closest friend and family members provided empirical observations from 2018 and 2019, depicting the Plaintiff's functional limitations, over an extended period of time. This evidence is consistent with the Plaintiff's claims and the evidence record as a whole. **(AR 249-251, 489-495)**

The Plaintiff's psychological therapist at AllHealth Network, Dalton Ross, LCSW, provided evidence based on face-to-face biweekly treatment sessions with the Plaintiff. His letter is consistent with the evidence of record, as a whole. **(AR 667)** He explained his insights into the Plaintiff's PTSD symptoms and therapy treatments, stating:

> *"Over the past year, Andrea and I have been utilizing evidence-based treatment modalities, such as EMDR (Eye-Movement Desensitization and Reprocessing), CBT (Cognitive Behavioral Therapy), and family therapy to help Andrea reduce and manage her PTSD and Depressive symptoms. Andrea's PTSD symptoms include: racing & intrusive thoughts, avoidance, flashbacks, nightmares, hypervigilance, and startle response. Andrea's depressive symptoms include: hopelessness, suicidal ideation, amotivation, decrease in ambition, and isolation."*

> *"Andrea is highly motivated for change and eager to learn and practice new coping skills to help her reduce and manage her PTSD and depression."* **(AR 22)**

The ALJ's findings of facts included the Plaintiff's psychiatric medications and related side effects of sedation and fatigue. **The ALJ did not directly refute any of the Plaintiff's claims regarding the side effects from medications. (AR 19)** In her decision, the ALJ stated:

1. *"The claimant has treated her mental health conditions with a variety of medication, including fluoxetine, bupropion, clonazepam, and Cymbalta (4F/3; 16F; 20F/2)."* **(id.)**

2. *"The claimant reported experiencing side effects from her psychotropic medication, such as sedation, drowsiness, fatigue, nausea, and dizziness (Hearing Testimony; 20F/2)."* **(id.)**

3. *"The claimant testified that she finds her psychotropic medications helpful, but she does not want to increase them due to the side effects, including sedation, flightiness, and weight-gain."* **(id.)**

4. *"She is drowsy due to the medication and has to nap during the day and cannot drive on Busparin[7]."* **(id.)**

5. *"The claimant specifically reported that her mood improved when her medications were tweaked (4F/70, 98; 16F/22, 24, 37, 60, 68, 88, 95)."* **(AR 20)**

6. *"The treatment records also reflect that when the claimant was not on her psychotropic medications, her mental health conditions deteriorated (4F/10)."* **(id.)**

The Plaintiff's psychiatric medications were adjusted significantly, from the time of her emotional breakdown in June 2017 until the ALJ

---

[7] "Busparin" is a misspelling of "Buspar", or the generic version of the same medication named "Buspirone".

hearing in September 2019, spanning a period of approximately 27 months. **(AR 309, 314, 323, 334,429, 608-610, 661)**

As of July 5, 2017, the Plaintiff's psychiatric medications and dosages were: 150mg daily of Wellbutrin XL; 20mg daily of Prozac, and up to 60mg daily of Buspar, as needed. **(AR 309)**. By comparison, at the date of the ALJ hearing on September 23, 2019, the Plaintiff's psychiatric medications and dosages had been increased to: 450mg daily of Wellbutrin XL; 100mg daily of Pristiq; 2mg daily of Klonopin, and up to 60 mg daily of Buspar, as needed. **(AR 661)**

The Plaintiff's dosages had been adjusted to mitigate her augmented symptoms of anxiety and depression, over time. The Plaintiff testified that her medications do not alleviate her mental health symptoms. She also testified that she suffers side effects of sedation and fatigue on a daily basis. **The ALJ confirmed the Plaintiff's testimony, stating: *"She is drowsy due to the medication and has to nap during the day." (AR 19)*** The ALJ also confirmed the Plaintiff's "severe impairments" in her decision. She stated:

1. *"The claimant has the following severe impairments: major depressive disorder; posttraumatic stress disorder (PTSD); generalized anxiety disorder; and adjustment disorder (20 CFR 404.1520(c) and 416.920(c))."* **(AR 16)**

2.  She further stated: *"The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28[8]."* **(id.)**

3.  She then continued: *"After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms…"* **(AR 20)**

Then the ALJ's logic abruptly reversed, and her reasons for denial of DIB are based on vague and unsupported facts. She contradicted her own confirmations when she stated:

1.  *"…however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."* **(id.)**

2.  *"As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the treatment records reflect that the claimant's mental health conditions improved as time progressed (4F; 16F)."* **(id.)**

---

8   This SSR is "SSR 85-28: Titles II and XVI: Medical Impairments That Are Not Severe". However, the ALJ had already confirmed the Plaintiff's impairments "severe". This inconsistency was not resolved in the ALJ's decision.

### III.    LEGAL ARGUMENTS

The Plaintiff respectfully contends that the ALJ made errors of law, as defined by the United States Federal Administrative Law, within Codes of Federal Regulations (CFRs) **20 CFR 404.1520 *et seq.*, and 20 CFR 416.920 *et seq.*,** and within **20 CFR 404.1529 *et seq.*;** and **20 CFR 416.929 *et seq.*.** She further contends that the ALJ erred by misapplying several rules in the Social Security Rulings (SSRs): **SSR 16-3p**, **SSR 96-8p** and **SSR 00-4p**.

The Plaintiff contents that ALJ's reasons for refuting her evidence are a skewed representation of the evidence of record, as a whole[9]. In most reasons, the ALJ cited a few obscure medical records that did not meet requirements of substantial evidence to support her decision of "not disabled". The determination whether substantial evidence supports the ALJ's decision *"is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion."* **(Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989))**

---

[9] The Plaintiff understands that the evidence of record consists of almost 700 pages, and therefore the ALJ's false presumptions could be attributed to time constraints of reviewing all the evidence. However, the Plaintiff also respectfully contends that the ALJ's reasons are not substantiated by the evidence of record, to explain her dismissal of evidence from the Plaintiff's treating psychiatrist, and omissions from the testimony of the VE. Overall, the ALJ relied mostly on the evidence from DDS, which was unreliable for the reasons that it was outdated by one year, excluded vital records and that DDS physicians had no contact with the Plaintiff, whatsoever.

**A. The ALJ erred by disregarding the Plaintiff's evidence from treating physicians and relied heavily on DDS recommendations.**

The ALJ erred by not finding the Plaintiff "disabled" at step three of the five-step sequential evaluation process for determining whether an individual is disabled **(20 CFR 404.1520(a) and 416.920(a))**. If the ALJ had properly examined and applied the Plaintiff's evidence, she would have found requirements of "paragraph A" and "paragraph B" both satisfied. **(20 CFR 404, Subpart P, Appendix 1)**

She would have found the Plaintiff "disabled" at step three, and discontinued further evaluation. These errors are harmful because they prompted the ALJ to find the Plaintiff "not disabled", when she was clearly "disabled". **(SSR 16-3p)**

In her decision, the ALJ did not refute that "paragraph A" requirements had already been satisfied for determining the Plaintiff disabled at step three, under listings 12.04 for depressive, bipolar and related disorders; 12.06 for anxiety and obsessive-compulsive disorders; and 12.15 for trauma- and stressor-related disorders, in the Listing of Impairments. **(20 CFR 404, Subpart P, Appendix 1)**

Furthermore, the Plaintiff's medical records from AllHealth Network confirm that her mental health diagnoses and treatment had begun in June 2017. (**AR 293-441, 563-662**) Thus, the Plaintiff's treatment had

continued significantly longer than twelve months, prior to the date of the ALJ hearing, on September 23, 2019, as required to satisfy "paragraph A" at step three. **(20 CFR 404.1520(a) and 416.920(a))**

However, the ALJ erred by rejecting each of the "marked" and "extreme" opinions from Dr Bali's professional mental health assessments in 2018 and 2019. These rejections by the ALJ caused criteria to remain unsatisfied in "paragraph B" of the mental health evaluation regarding "severity and persistence" of functional limitations for determining the Plaintiff disabled at step three, under listings 12.04, 12.06 and listing 12.15, in the Listing of Impairments. **(20 CFR 404.1520(a) and 416.920(a) and 20 CFR 404, Subpart P, Appendix 1).**

In addition, Dr. Bali's professional mental evaluation in September 2019 (a few weeks prior the ALJ hearing), states that the Plaintiff's prognosis was "fair" and her response to treatment was also "fair". **(AR 669)** Dr. Bali also stated "…symptoms are recurrent and severe which impair functioning". **(AR 674)** The ALJ's reasons for finding Dr. Bali's opinions unpersuasive are not substantial, nor consistent with the evidence of record, as a whole. **((20 CFR 404.1520(c)(3) and 20 CFR 416.929(c)(3)) (SSR 16-3p)** The ALJ stated:

> *"The undersigned finds these opinions to be unpersuasive*
> *as they are not supported by Dr. Bali's treatment records,*
> *which showed that the claimant's mental health conditions*

*improved between after the alleged onset date (4F; 16F). It*

*is also not consistent with the results of the mental status*

*examinations, which largely showed normal concentration,*

*attention, and memory (4F; 15F/7; 16F)."* **(AR 21)**

In her RFC, the ALJ erred by disregarding Dr. Bali's objective

medical evidence, regarding absenteeism. Dr. Bali stated in September

2019 (a few weeks prior to the ALJ hearing), that the Plaintiff's

impairments were anticipated to cause her to be absent from work *"more*

*than four days per month"*. **(AR 67) (20 CFR 404.1520(c)(3) and 20 CFR**

**416.929(c)(3)) (SSR 16-3p)**

The ALJ stated:

*"Further, she opined that the claimant would likely miss more*

*than four days of work per month if she were to work on a*

*full-time basis (20F/7)."* **(AR 21)**

*"The undersigned finds these opinions to be unpersuasive*

*as they are not supported by Dr. Bali's treatment records,*

*which showed that the claimant's mental health conditions*

*improved between after the alleged onset date (4F; 16F). It*

*is also not consistent with the results of the mental status*

*examinations, which largely showed normal concentration,*

*attention, and memory (4F; 15F/7; 16F)."* **(id.)**

The ALJ erred by finding the opinions from DDS non-treating physicians most persuasive, while finding the Plaintiff's objective medical evidence unpersuasive. She further erred by disregarding longitudinal evidence depicting the Plaintiff's extended history of mental health disorders, precipitated by long-term persistent trauma beginning in her childhood. **(AR 269-286, 467-486)** These errors are harmful because the ALJ disregarded the pertinent facts of the Plaintiff's claim, and was prompted to find the Plaintiff "not disabled", when she clearly was "disabled". **(20 CFR 404.1520(c) and 20 CFR 416.929(c)) (SSR 16-3p)**

**DDS physicians had no contact with the Plaintiff**, whatsoever. DDS recommendations were derived exclusively from review of the Plaintiff's application forms and incomplete, deficient medical records. **(20 CFR 404.1520(c)(3) and 20 CFR 416.929(c)(3))**

The ALJ erred by relying heavily on DDS findings to refute the Plaintiff's strong material evidence, from her long-term treatment at AllHealth Network. **(AR 293-441 and 563-662)**

The Plaintiff has an extensive relationship with Dr. Maninder Bali, MD., from whom she received continuous psychiatric beginning June 2017, and extending well beyond the ALJ hearing on September 23, 2019. The Plaintiff attended consistent appointments with Dr. Bali every three months. Dr. Bali also accommodated additional treatment whenever the Plaintiff requested appointments to address problems caused by her

psychiatric medications. **(20 CFR 404.1520(c)(3) and 20 CFR 416.929(c)(3))**

The Plaintiff's evidence supports the extent of the treatment relationship. Dr. Bali's mental health evaluations from 2018 and 2019 clearly state the Plaintiff's limitations, derived by method of professional and legal metrics, submitted to the Court in standardized mental health assessment forms. **(AR 498-502, 668-674) (20 CFR 404.1520(c)(3) and 20 CFR 416.929(c)(3))**

Regarding "Specialization", Dr. Bali's qualifications include advanced education and more than thirteen years of experience practicing psychiatric medicine**. (AR 502) (20 CFR 1520(c)(4)) and 20 CFR 416.929(c)(4))**

The ALJ erred by disregarding the profound significance of longitudinal evidence, depicting details of the Plaintiff's professional mental health treatment, spanning from 2003 to 2016. **(AR 269-286, 467-486)** The ALJ misapplied SSR 16-3p, which clearly states:

> *"Important information about symptoms recorded by medical sources and reported in the medical evidence may include, but is not limited to, the following:  Onset, description of the character and location of the symptoms, precipitating and aggravating factors, frequency and duration, change over a period of time (e.g., whether worsening, improving, or static),*

> *and daily activities" … "A longitudinal record of any treatment*
>
> *and its success or failure, including any side effects of*
>
> *medication.* **(20 CFR 404.1520(c)(3) and 20 CFR**
>
> **416.929(c)(3)) (SSR 16-3p)**

**B. The ALJ erred in her review of other medical evidence.**

The ALJ erred by refusing to evaluate nonmedical evidence, from

the Plaintiff's **closest friend and family members in 2018 and 2019**.

These personal observations of the Plaintiff's functional impairments over

an extended period of time, are consistent with the evidence of record, as

a whole. **(AR 249-251, 489-495)** The ALJ stated her reason for excluding

this important evidence: ***"Since these are not medical opinions, the***

***undersigned need not specifically evaluate these statements."***

**(AR 22)** The ALJ misapplied SSR 16-3p, which clearly states the required

diligence to examine non-medical evidence:

> *"If we cannot make a disability determination or decision that*
>
> *is fully favorable based solely on objective medical evidence,*
>
> *then we carefully consider other evidence in the record in*
>
> *reaching a conclusion about the intensity, persistence, and*
>
> *limiting effects of an individual's symptoms."*
>
> *"Examples of such sources include public and private*
>
> *agencies, other practitioners, educational personnel, non-*

*medical sources such as family and friends, and agency*

*personnel. The adjudicator will consider any personal*

*observations of the individual in terms of how consistent*

*those observations are with the individual's statements about*

*his or her symptoms as well as with all of the evidence in the*

*file"* **(20 CFR 404.1529(c)(3) and 416.929(c)(3) (SSR 16-3p)**

The ALJ erred by disregarding evidence from the Plaintiff's

**treating psychological therapist** at AllHealth Network, Dalton Ross,

LCSW. His evidence is based on **face-to-face bi-weekly treatment**

sessions with the Plaintiff, and his letter is consistent with the evidence of

record, as a whole. **(AR 667)** Mr. Ross explained his insights into the

Plaintiff's PTSD symptoms and therapy treatments, stating:

*"Over the past year[10], Andrea and I have been utilizing*

*evidence-based treatment modalities, such as EMDR (Eye-*

*Movement Desensitization and Reprocessing), CBT*

*(Cognitive Behavioral Therapy), and family therapy to help*

*Andrea reduce and manage her PTSD and Depressive*

*symptoms. Andrea's PTSD symptoms include: racing &*

---

[10] Dalton Ross was the Plaintiff's therapist for a year prior to the ALJ hearing in September 2019. The Plaintiff had also been in treatment with two previous therapists at AllHealth Network, beginning July 5, 2017. As reflected in the evidence **(AR 293-441, 563-662),** the Plaintiff's therapy remained consistent, with bi-weekly appointments for the duration of July 2017 until September 2019.

> *intrusive thoughts, avoidance, flashbacks, nightmares,*
>
> *hypervigilance, and startle response. Andrea's depressive*
>
> *symptoms include: hopelessness, suicidal ideation,*
>
> *amotivation, decrease in ambition, and isolation."* **(AR 22)**
>
> **(20 CFR 404.1529(c)(3) and 416.929(c)(3) (SSR 16-3p)**

**C. The ALJ erred in her review of the Plaintiff's testimony and other evidence supporting her claims.**

The ALJ erred by disregarding vital factors in the evidence of record, which support the Plaintiff's claims of "intensity, persistence and limiting effects" of her mental health condition. The Plaintiff's professional mental health evaluations in 2018 and 2019 clearly state her "marked" and "extreme" limitations, over an extended period of time. **(AR 498-502, 668-674)** Furthermore, the Plaintiff's ongoing tailored treatment history with several mental health specialists: Dr. Williams **(AR 269-286)**; Dr. Greher **(AR 548-552)**; and Dr. Bali **(AR 293-441 and 563-662)**; and escalating prescription history **(AR 309, 314, 323, 334, 429, 608-610, 661)** are consistent indications that her functional limitations are undeniably "intense" and "persistent". The ALJ misapplied SSR 16-3, which clearly states:

> *"Persistent attempts to obtain relief of symptoms, such as*
>
> *increasing dosages and changing medications, trying a*
>
> *variety of treatments, referrals to specialists, or changing*

> *treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent."* **(SSR 16-3p)**

The ALJ further erred by disregarding the Plaintiff's testimony describing her severe symptoms of daily fatigue, and her statements explaining that she must rest or nap after approximately two hours of concentration. She stated:

> *"The claimant also reported experiencing fatigue (3E/2; 4F/124). However, there is no medically determinable impairment in the treatment records to explain the claimant's fatigue[11] (1F-20F)."* **(AR 16)**

Paradoxically, **the ALJ did not directly refute the Plaintiff's testimony describing side effects of her medications**. This inconsistency was not resolved in her decision. She stated:

> *"The claimant reported experiencing side effects from her psychotropic medication, such as sedation, drowsiness, fatigue, nausea, and dizziness (Hearing Testimony; 20F/2)."*
>
> *… "She is drowsy due to the medication and has to nap during the day and cannot drive on Busparin."* **(AR 19)**

---

[11] The Plaintiff argues that her severe side effects from prescribed medications are sufficient, as a *"medically determinable impairment in the treatment records to explain the claimant's fatigue"*. Furthermore, the ALJ did not directly dispute the Plaintiff's testimony regarding side effects of her medications. **(AR 19)**

The Plaintiff's claims of fatigue are consistent with the evidence of record. The ALJ's reason for refuting fatigue stating: **"***However, there is no medically determinable impairment in the treatment records to explain the claimant's fatigue[12] (1F-20F).***"** is a direct misapplication of SSR 16-3p:

> *"However, we will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual."* **(CFR 404.1529(c)(2) and 416.929(c)(2) (SSR 16-3p)**

> *"Your symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, are considered in making a determination as to whether your impairment or combination of impairment(s) is severe."* **(CFR 404.1529(c)(4) and 416.929(c)(4) (SSR 16-3p)**

The ALJ erred by relying heavily on a small number of citations regarding the Plaintiff's mental status as "normal" or "above average", to refute the Plaintiff's claims. **(AR 17-22)** She cited exhibit "15F/7" more

---

[12] The Plaintiff argues that her severe side effects from prescribed medications are sufficient, as a *"medically determinable impairment in the treatment records to explain the claimant's fatigue".* Furthermore, the ALJ did not directly dispute the Plaintiff's testimony regarding side effects of her medications. **(AR 19)**

than twenty times. This exhibit "15F/7" represents just one page of cursory notes from UCHealth, dated December 13, 2018. **(AR 538)**

Furthermore, ALJ's citations do not accurately portray the context within which the UCHealth records were documented. In his summary of findings, the Plaintiff's treating neuropsychologist, Dr. Greher, clarified a common misconception related to the discrepancy between the Plaintiff's positive test results compared to her functional limitations. On March 19, 2019, Dr. Greher stated:

> *"Of course, it is understood that there is a notable discrepancy between the patient's cognitive complaints and her actual abilities observed in objective testing. Such discrepancies are not uncommon in patients with significant psychological challenges and stressors, which tend to impact people more negatively in the course of more challenging demands of everyday life than they do in the controlled environment of neuropsychological testing."*

> *"I obviously fully support the patient's ongoing mental health treatments at AllHealth, given the chronic and severe nature of these challenges, and encourage her to inquire as to whether more frequent consultations with her psychiatrist (e.g., once per month) are possible, to help maximize her*

*benefit.*" **(AR 549) (20 CFR 404.1520(c)(3) and 20 CFR 416.929(c)(3)) (SSR 16-3p)**

Likewise, the ALJ erred by relying heavily on hearing exhibits "4F" and "16F" to refute the Plaintiff's evidence. She repeatedly stated: "***the claimant's mental health conditions improved after the alleged onset date** (4F; 16F).*" **(AR 293-441, 563-662)**. These two exhibits represent hundreds of pages of medical records from AllHealth Network.

The ALJ's citations are isolated and misleading, because she excluded all references within her exhibits "4F" and "6F" which clearly stated Plaintiff's status was "abnormal" and "unstable/worsening". She also excluded all references to the Plaintiff's condition classified as "chronic". **(20 CFR 404.1529(c)(3) and 416.929(c)(3) (SSR 16-3p)** The following are examples of the ALJ's exclusions:

1. *"abnormal"* **(AR 333, 349, 428, 571, 576, 595, 620, 626)**
2. *"unstable/worsening"* **(AR 322-324, 333-334, 350-351, 566-567, 571-572, 577-578, 596, 622, 627-628)**
3. *"chronic"* **(AR 320, 322, 331, 395, 425, 436, 574, 580, 592, 599, 618, 624, 630, 650, 657)**

The ALJ erred by relying on vague conclusions for refuting the Plaintiff's claims, and did not provide substantial evidence to support her

reasons. She ultimately found the Plaintiff "not disabled", stating this
ambiguous phrase:

> "…however, the claimant's statements concerning the
> intensity, persistence and limiting effects of these symptoms
> are not entirely consistent with the medical evidence…"
> **(AR 20)**

The ALJ misapplied SSR 16-3p, which clearly states rules required
for adjudication, when evaluating symptoms in the five-step sequential
evaluation process to determine whether an individual is disabled:

> "In evaluating an individual's symptoms, it is not sufficient for
> our adjudicators to make a single, conclusory statement that
> "the individual's statements about his or her symptoms have
> been considered" or that "the statements about the
> individual's symptoms are (or are not) supported or
> consistent." It is also not enough for our adjudicators simply
> to recite the factors described in the regulations for
> evaluating symptoms. The determination or decision must
> contain specific reasons for the weight given to the
> individual's symptoms, be consistent with and supported by
> the evidence, and be clearly articulated so the individual and

>> *any subsequent reviewer can assess how the adjudicator*
>> *evaluated the individual's symptoms."* **(SSR 16-3p)**

**D. The ALJ erred in her development of the Plaintiff's RFC.**

In her RFC, the ALJ erred by not providing substantial evidence to support her findings of the Plaintiff's abilities *"to perform a full range of work at all exertional levels"*, based on the evidence of record. **(AR 18)** She also erred by not providing substantial evidence of record to support her reasons for refuting the Plaintiff's claims of functional limitations that prevent her from sustaining energy and concentration for an entire day of work. The ALJ misapplied SSR 96-8p, which clearly states:

>> *"Ordinarily, RFC is an assessment of an individual's ability to*
>> *do sustained work-related physical and mental activities in a*
>> *work setting on a regular and continuing basis. A "regular*
>> *and continuing basis" means 8 hours a day, for 5 days a*
>> *week, or an equivalent work schedule."* **(SSR 96-8p)**

Furthermore, the ALJ erred by disregarding the Plaintiff's testimony describing the daily interruptions she encounters, due to sudden anxiety. The ALJ stated: *"The claimant also testified that she has full-blown panic attacks once per month and her anxiety interrupts her day several times daily (Hearing Testimony)."* **(AR 19)** This testimony is consistent with the evidence of record, as a whole. The ALJ further erred by not providing

substantial evidence to support her reasons for disregarding the effects of intermittent daily anxiety on the Plaintiff's abilities. The ALJ misapplied SSR 96-8p, which clearly states:

> *"The adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC. Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone."* **(id.)**

The ALJ erred by disregarding the Plaintiff's consistent evidence, supporting claims that she suffers from severe and persistent exertional limitations, precipitated by her chronic non-exertional limitations. The ALJ misapplied SSR 96-8p, which clearly states:

> *"The RFC assessment must address both the remaining exertional and nonexertional capacities of the individual."* … *"Likewise, even though mental impairments usually affect non-exertional functions, they may also limit exertional capacity by affecting one or more of the seven strength demands. For example, a mental impairment may cause fatigue or hysterical paralysis."* **(id.)**

**E.  The ALJ erred by misapplying testimony from the VE in her decision.**

The ALJ erred by not providing substantial evidence to support her findings from the testimony of the VE. She further erred by omitting material evidence from the VE without any discussion of the omissions in her decision. **(AR 58-59)** She further erred by not explaining how she resolved conflicts and inconsistencies in her findings of facts, based on the evidence of record. **(AR 24, 59-60) (SSR 00-4p)** These errors are harmful because they prompted` the ALJ to find the Plaintiff "not disabled", when she clearly was "disabled".

The ALJ erred by omitting from her decision all references regarding the impact of combining a limitation of off-task interruptions with the Plaintiff's RFC. Testimony from the VE confirmed that off-task interruptions of fifteen percent or more per workday would effectively eliminate all position-s listed in the DOT, when combined with the Plaintiff's RFC. **(AR 58-59) (SSR 00-4p)**

The ALJ further erred by omitting from her decision all references regarding the impact of combining a limitation of absenteeism with the Plaintiff's RFC. Testimony from the VE confirmed that absenteeism of two days per month or more would effectively eliminate all positions listed in the DOT, when combined with the Plaintiff's RFC. **(AR 59) (SSR 00-4p)**

The ALJ erred by finding the Plaintiff "not disabled", without resolving the discrepancies raised by the VE's testimony, where he clarified that RFC limitations of "low-stress work" and "production rate" are not included in the DOT. **(AR 59-60)** During his testimony, the VE clarified that his vocational recommendations were based on his professional experience, and not the DOT definitions. He explained that most of the non-exertional limitations in the RFC are not included in the DOT.

While the ALJ resolved the discrepancies involving "interaction with others", she did not resolve limitations of "low-stress work" and "production rate", which are specified in the RFC, but not included in the DOT. The ALJ misapplied SSR 00-4p, when she stated:

> *"To the extent that the DOT does not consider limited interaction with others in the positions listed above, the undersigned relies on the vocational expert's education, experience, and training. Accordingly, the undersigned finds the vocational expert's testimony reliable."* **(AR 24)**

The ALJ erred by not discussing, nor resolving contradictions within her findings of facts. Testimony from the VE regarding absenteeism and off-task interruptions was omitted from her decision, without any mention. She also left unresolved the discrepancy regarding RFC limitations of "low-stress work" and "production rate", which were not included in the DOT. SSR 00-4p clearly states:

*"When vocational evidence provided by a VE or VS[13] is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified."* **(SSR 00-4p)**

*"In particular, this ruling emphasizes that before relying on VE or VS evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), published by the Department of Labor"* and *"Explain in the determination or decision how any conflict that has been identified was resolved."* **(id.)**

---

[13] "VS" is an acronym for "Vocational Specialist". The ALJ hearing did not include a Vocational Specialist.

**IV.    CONCLUSION AND REQUEST FOR RELIEF**

For the foregoing reasons, the Plaintiff is entitled to an immediate award of DIB without further delay. The Plaintiff respectfully requests the Court to order her DIB to be paid immediately. Alternatively, the Plaintiff requests a remand for further proceedings.

Respectfully Submitted, on this 29th day of October, 2020.

s/ Andrea C Johnston

ANDREA C JOHNSTON
6217 South Sterne Parkway
Littleton, CO  80120
(720) 447-2039
ajohnston@virtualindeed.com

Plaintiff, *Pro Se*

**CERTIFICATE OF SERVICE BY ECF COURT FILING**

DATED this 29th day of October, 2020.

The foregoing Plaintiff's Opening Brief was served by Electronic Court Filing (ECF) to:

> JASON R. DUNN
> Acting United States Attorney
>
> J. BENEDICT GARCÍA
> Assistant United States Attorney
> United States Attorney's Office
> District of Colorado
>
> NOAH SCHABACKER
> Special Assistant United States Attorney
> Office of the General Counsel
> Social Security Administration
> 1961 Stout Street, Suite 4169
> Denver, CO 80294-4003
> Telephone: (303) 844-6232
> noah.schabacker@ssa.gov
>
> Attorneys for Defendant

By s/ Andrea C Johnston

ANDREA C JOHNSTON
6217 South Sterne Parkway
Littleton, CO  80120
(720) 447-2039
ajohnston@virtualindeed.com

Plaintiff, *Pro Se*